**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LISA STEPHENS,

         *Plaintiff*,

    v.

JANET YELLEN,[1]
Secretary, U.S. Department of the Treasury,

       *Defendant.*

No. 17-cv-1252 (DLF)

<u>**MEMORANDUM OPINION**</u>

Lisa Stephens brings this Title VII action against her former employer, the U.S. Department of the Treasury, asserting that it discriminated against her based on race and sex, retaliated against her for engaging in protected activity, and subjected her to a hostile work environment. Before the Court is Treasury Secretary Janet Yellen's Motion for Summary Judgment, Dkt. 42. For the reasons that follow, the Court will grant the motion.

**I.**  **BACKGROUND**

    **A.**  **Factual History**

Stephens, an African-American woman, started work as the Shared National Credit (SNC) Program Manager at the Office of the Comptroller of the Currency (OCC), a bureau within the Treasury Department, on July 1, 2012. Def.'s Statement of Undisputed Material Facts

---

[1] When this suit began, Steven Mnuchin was the Secretary of the Department of the Treasury. When Janet Yellen became the Secretary, she was automatically substituted as the proper defendant. *See* Fed. R. Civ. P. 25(d).

(Def.'s Statement of Facts) ¶¶ 1, 3, Dkt. 42-2.[2]  She served under a one-year probationary term set to end on June 30, 2013.  *Id.* ¶ 2.  She was hired by, and reported to, Vance Price, the Deputy Comptroller for Large Bank Supervision.  *Id.* ¶ 4; Def.'s Mot. Ex. 5 (Price Decl.) ¶ 5, Dkt. 42-3.  She was responsible for supervising two employees, Jamie-Jo Perry and Christal Coppedge, both white women.  Def.'s Statement of Facts ¶ 5.

The parties dispute Stephens' effectiveness as a manager and communicator.  *Compare* Def.'s Statement of Facts ¶¶ 9–10, 34, 37 *with* Pl.'s Statement of Disputed Material Facts (Pl.'s Statement of Facts) ¶¶ 9–10, Dkt. 48-1.  The Secretary reports that Stephens often emailed Price with various queries about the "day-to-day administration of the SNC unit," causing him to "question [Stephens's] ability to be an effective manager and appropriately raise issues to his attention."  Def.'s Statement of Facts ¶ 10(a)–(h) (citing emails in the record).[3]  Price felt that Stephens's communications with her subordinates and colleagues in emails and during meetings "were not consistently professional, clear, or appropriate."  *Id.* ¶ 9.  Meanwhile, Stephens claims that Price had not alerted her to any of these problems before her June 5, 2013 Interim Review Meeting, near the end of her employment.  Pl.'s Statement of Facts ¶¶ 7, 9.

Stephens's main issue during her time as SNC Program Manager was her difficult relationship with her supervisee, Perry.  According to the Secretary, Stephens "reported experiencing challenges in managing Ms. Perry" throughout her tenure.  Def.'s Statement of Facts ¶ 7.  Stephens points to "Ms. Perry's insubordination and disrespectful conduct, leave

---

[2] The Court cites to the defendant's Statement of Facts if a fact is undisputed.  If a fact is disputed, the Court will indicate as such.

[3] Stephens purports to dispute this in her Statement of Facts, but her explanation relates to a different aspect of the case, not her communications with Price about administering her unit.  *See* Pl.'s Statement of Facts ¶ 10.

abuse, and failure to perform her job." Pl.'s Statement of Facts ¶ 7.  The Secretary says that

Stephens asked for, and received help, from another OCC advisor, Jennifer Eccles, along with

Linda Medina, a Labor and Employee Relations Specialist, as early as September 2012.  Def.'s

Statement of Facts ¶¶ 12, 14 (citing emails in the record).  Stephens agrees that she tried to work

with Human Resources to address the problems with Perry.  Pl.'s Statement of Facts ¶ 7.  But the

parties disagree about the nature of Price's involvement: the Secretary claims that Price assisted

Stephens by "communicating with the SNC team directly, emphasizing [Stephens's] role as

manager of the SNC program, and encouraging [Stephens] to deal directly with Ms. Perry."

Def.'s Statement of Facts ¶ 13.  Stephens challenges Price's handling of the situation, stating that

he "failed to address Ms. Perry's conduct and performance issues."  Pl.'s Statement of Facts ¶ 7,

8.[4]  But Stephens does not deny that she emailed Price repeatedly about issues with Perry,

seeking advice and providing updates.  *See* Def.'s Statement of Facts ¶ 8 (citing emails in the

record).

    As a manager, Stephens was responsible for approving or denying her subordinates'

requests for leave no later than 10 workdays after receiving them.  *See* Def.'s Mot. Ex. 56

(Policies and Procedures Manual – Leave Administration), at 10, Dkt. 42-3.  This became

another source of tension between Stephens and Perry.  According to the Secretary, Stephens

failed on numerous occasions to approve Perry's leave requests in a timely fashion, "as required

under the Leave Policies and Procedures Manual and the Collective Bargaining Agreement."

---

[4] The Secretary refers to extensive email communication to demonstrate the nature of the
assistance provided by Eccles, Medina, and Price.  *See* Def.'s Statement of Facts ¶¶ 12–14.
Stephens disputes these statements as "mischaracterizations" or "misstatement[s]" of "the emails
and communication," but neither cites to record evidence nor explains how the Secretary
mischaracterizes the emails.  *See* Pl.'s Statement of Facts ¶¶ 12–14.  Her responses therefore do
not comply with Local Rule 7(h).  *See* LCvR 7(h) (requiring the nonmovant's statement of
disputed facts to "include references to the parts of the record relied on to support the statement).

Def.'s Statement of Facts ¶ 25; *see also id.* ¶¶ 15–25.  But Stephens claims that she did not act on

the requests both because Perry did not follow the proper steps and because Stephens believed

she was not always entitled to leave.  Pl.'s Statement of Facts ¶¶ 15–25.  The Secretary also

notes that Stephens waited too long to decide Coppedge's leave requests.  Def.'s Statement of

Facts ¶ 26.  Without providing any specifics, Stephens disputes this as "false and incomplete."

Pl.'s Statement of Facts ¶ 26.[5]

Stephens was also responsible for delivering interim and annual performance reviews to

her supervisees.  Def.'s Mot. Ex. 79 (Policies and Procedures Manual – Performance

Management Program), at 9–10, 12, Dkt. 42-3.  The Secretary claims that Stephens failed to

provide Coppedge with her 2012 annual review, Def.'s Statement of Facts ¶ 28, though Stephens

counters that she had been told that at that point, she was not on the job long enough to give the

evaluation, *see* Pl.'s Statement of Facts ¶ 28 (citing Pl's Response to Termination Notice at 123);

*see also* Def.'s Mot. Ex. 80 (Jan. 24, 2013 Email Exchange), Dkt. 42-3.[6]  Further, the Secretary

submits that, although interim reviews were supposed to be delivered by the end of April,

Stephens had not yet completed her reviews as of June 5, 2013.  Def.'s Statement of Facts ¶ 35.

Stephens challenges this as "incomplete," noting that she was not trained about interim

performance reviews.  Pl.'s Statement of Facts ¶ 35.  It is undisputed, however, that all

---

[5] To support this contention, Stephens points only to the unsworn letter she sent to Price after she received the notice of termination.  Pl.'s Opp. Ex. 11 (Response to Termination Notice), at 119–25, Dkt. 50-2.  Her letter admits that she sometimes "hesitated" to act on her supervisees' leave requests, explaining that this occurred when she needed to ask Price "clarifying questions" about the agency's leave policies.  *Id.* at 122.

[6] The record reflects, however, that Stephens knew that she had to provide Perry with her evaluation by the end of December 2012.  Def.'s Mot. Ex. 77, at 1 (Dec. 20, 2012 Email from Stephens to Price) (explaining that they needed to set up a meeting with Perry to "have the review/performance discussion with her" before the end of December).

employees were provided access to the Policies and Procedures Manual, which explains that supervisors should provide interim reviews "as close as possible to the midpoint of the performance period."  Def.'s Statement of Facts ¶ 6; Policies and Procedures Manual – Performance Management Program at 9.

In early 2013, Perry filed an Equal Employment Opportunity (EEO) complaint against the OCC, naming Stephens as the responsible manager.  Def.'s Statement of Facts ¶ 29.  And on February 5, 2013, Stephens told Rebecca Tudisco, the OCC's Supervisory EEO Specialist, that she was interested in filing her own EEO complaint against Perry, but she did not ultimately file the complaint.  Id. ¶¶ 30–31.  The Secretary asserts that Price never knew that Stephens considered filing an EEO complaint against Perry.  Id. ¶ 32.  Stephens disputes this as "incomplete," describing Price's knowledge of Perry's attacks on Stephens.  Pl.'s Statement of Facts ¶ 32.  But she does not claim that Price actually knew about her discussions with Tudisco about filing an EEO complaint.  Id.

On June 4, 2013, Price met with Stephens to deliver her interim performance review, covering the period of October 1, 2012, through March 31, 2013.  Def.'s Statement of Facts ¶ 33; see also Def.'s Mot. Ex. 82 (2013 Interim Performance Discussion), Dkt. 42-3.[7]  The review explained that "[t]he personnel issues within the department are affecting [her] management of the unit."  2013 Interim Performance Discussion at 3.  To improve, the review directed her to "[t]ake timely action on leave requests," "[e]nsure expectations are consistent for all team members, e.g. flexible work schedules, work-at-home requests, leave requests, etc.," and

---

[7] Stephens purports to dispute this as "incomplete," but provides no detail and again points generally to her unsworn Response to Termination Notice.  Pl.'s Statement of Facts ¶ 33.  Thus, the Court takes as fact that Price and Stephens met on June 4, 2013, to review her interim performance review.

"[p]rovide constructive, timely feedback, including annual performance evaluations and interim discussions." *Id.* Additionally, her "communication with the team and others could also be improved." *Id.* Accordingly, she was told to be more "professional" in her communications with directors of other departments and her own staff. *Id.*

About a week later, on June 12, 2013, Price met with Stephens to deliver her a written notice of termination. Def.'s Statement of Facts ¶ 36; *see also* Def.'s Mot. Ex. 85 (Termination Notice), Dkt. 42-3. The Notice explained that she had not met the "acceptable performance levels" in two skill elements: "Communication and Interpersonal Skills" and "Personnel Management Skills," providing details for each element. Termination Notice at 1–3. The Notice further noted that Stephens had ignored Price's suggestions for communicating and managing staff, and had "provided [him] with hundreds of e-mails mainly focused on updates to [him] and requesting [his] assistance in day-to-day management issues that mostly are [her] issues to address as a management official." *Id.* at 2. Stephens resigned on June 28, one day before her termination would have taken effect. Def.'s Statement of Facts ¶¶ 36, 38.

## B.    Procedural History

On July 16, 2013, Stephens initiated contact with an EEO Counselor, who issued a Report of Counseling. Def.'s Mot. to Dismiss Ex. A (Report of EEO Counseling), Dkt. 9-1; *see also* Compl. ¶ 2. On August 26, Stephens submitted an individual complaint to the Treasury Department. Def.'s Mot. to Dismiss Ex. B (Formal Complaint), Dkt. 9-2; *see also* Compl. ¶ 2. After the Treasury Department completed an investigation, Stephens opted for a hearing before an administrative judge of the Equal Employment Opportunity Commission (EEOC). Stephens withdrew her individual complaint after the Treasury Department's motion for a decision had been pending before the administrative judge for approximately one year. *See* Def.'s Mot. to Dismiss Ex. E (EEOC Dismissal), Dkt. 9-5.

Stephens then filed this case, asserting three claims under Title VII of the Civil Rights Act: disparate-treatment discrimination based on race and gender, hostile work environment, and retaliation.  Compl. ¶¶ 36–54.  The Secretary filed a partial motion to dismiss for failure to exhaust administrative remedies, Def.'s Mot. to Dismiss, Dkt. 9, that the Court granted, Mem. Op. at 7, Dkt. 16.  It dismissed her discrimination and retaliation claims to the extent they were based on acts that took place prior to June 2013, as they occurred earlier than forty-five days before she initiated contact with the EEO counselor.  *Id*.  Thus, the only alleged discriminatory or retaliatory acts remaining in the case are the negative performance review and notice of termination.[8]  Similarly, the Court held that Stephens's hostile work environment claim could only rely on the June 2013 incidents.  *Id.* at 11.  Finally, because Stephens's EEO complaint only recounted protected EEO activity alleged to have occurred in February and March 2013, the Court held that her retaliation claim could be premised only on those activities, not on any earlier protected activity.  *Id.* at 7.

## II.    LEGAL STANDARD

Under Rule 56, summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986).  A "material" fact is one that could affect the outcome of the lawsuit.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving

---

[8] Stephens's complaint alleged numerous discriminatory or retaliatory acts that occurred before June 2013—namely, that her employer provided insufficient training and assistance, failed to address Perry's insubordination, undermined Stephens' attempt to manage subordinates, and required her to perform duties outside her job description.  *See* Compl. ¶¶ 40, 53.

party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.  In reviewing the record, the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

A party "opposing summary judgment" must "substantiate [its allegations] with evidence" that "a reasonable jury could credit in support of each essential element of [its] claims." *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015).  The moving party is entitled to summary judgment if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   ANALYSIS

### A.   Race and Sex Discrimination

First, Stephens claims that the Treasury discriminated against her on the basis of race and sex in violation of Title VII.  Compl. ¶¶ 36–41.  Title VII bars employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex." 42 U.S.C. § 2000e-2(a)(1).

Where a plaintiff offers only circumstantial evidence of discrimination, courts evaluate claims under Title VII using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972); *see Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010).  Under that framework, the employee "must first make out a prima facie case" of discrimination.  *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019).  The burden then shifts to the employer to "come forward with a legitimate reason for the challenged action."  *Id.*  If the employer satisfies that burden, the court "must conduct one central inquiry in deciding an employer's motion for summary judgment: whether the plaintiff produced sufficient

evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason [for its action] and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Id.* (internal quotation marks omitted).  The D.C. Circuit has emphasized that "the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (alterations and internal quotation marks omitted).  If the employer carries its burden to provide evidence of a legitimate, non-discriminatory reason for the challenged action, the district court "need not—and should not—decide whether the plaintiff actually made out a prima facie case." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  Instead, the court's analysis should focus on whether the plaintiff can meet his or her burden to show that the employer's explanation is merely a pretext for discrimination.  *See id.*

 For purposes of an employment discrimination claim, "an employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002).  This Circuit has described a "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Stephens points to her negative performance review and notice of termination to support her discrimination claim.  The notice of termination undoubtedly qualifies as an adverse

employment action, but unsatisfactory performance reviews, "if not abusive in tone or language or a predicate for a more tangible form of adverse action, will rarely constitute materially adverse action under Title VII." *Hyson v. Architect of Capitol*, 802 F. Supp. 2d 84, 102 (D.D.C. 2011). But given that Stephens received her performance review just one week before her firing, and the negative comments in the review were repeated in the notice of termination, *compare* 2013 Interim Performance Discussion *with* Termination Notice, the Court assumes that the negative performance review qualifies as an adverse action and will consider it along with the notice of termination in assessing Stephens's discrimination claims.  Because the Secretary has asserted non-discriminatory justifications for both these adverse actions, the Court will not consider whether Stephens made out a prima facie case of employment discrimination but will instead proceed to assessing the Secretary's rationales and Stephens's evidence of pretext.

      *1.   Legitimacy of the Secretary's Justification*

      Step two of the McDonnell Douglas analysis requires an employer to "come forward with a legitimate reason for the challenged action."  *Iyoha*, 927 F.3d at 566.  The D.C. Circuit has recently emphasized four factors that should be "paramount in the analysis" of whether an employer has met this burden.  *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019). Namely, at step two: (1) the employer must produce evidence that would be admissible at trial for a finder of fact; (2) "the factfinder, if it believed the evidence, must reasonably be able to find that the employer's action was motivated by a nondiscriminatory reason"; (3) the employer's justification must be "facially credible in light of the proffered evidence"; and (4) the employer must provide a "clear and reasonably specific explanation" for its action that is "articulated with some specificity."  *Id.* at 1087–88 (citations and internal quotation marks omitted).

      The Secretary contends that Stephens received her negative performance review and

notice of termination because she lacked critical communication and personnel-management skills. The Court will consider the Secretary's proffered evidence because Stephens neither contests nor objects to its admissibility; thus, the first *Figueroa* factor is satisfied. *Hogan v. Hayden*, 406 F. Supp. 3d 32, 43 (D.D.C. 2019). And under the second factor, the Secretary's evidence would allow a jury to reasonably conclude that the Treasury had neutral reasons, unrelated to race or sex, to take steps to terminate Stephens. Dissatisfaction with a plaintiff's performance is a legitimate and non-discriminatory reason for an adverse action. *See Hogan*, 406 F. Supp. 3d at 44 (crediting an employer's concern over its employee's inappropriate emails); *Walden v. Patient-Centered Outcomes Research Inst.*, 304 F. Supp. 3d 123, 139 (D.D.C. 2018).

The record evidence proffered by the Secretary supports Price's stated reasons for giving Stephens a negative performance review and notice of termination. To start, the notice of termination expressed Price's frustration that Stephens involved him far too extensively in the management of her department. Termination Notice at 2. Stephens frequently emailed Price about general management questions, along with complaints about Perry. *See, e.g.*, Def.'s Mot. Exs. 11, 15, 16, 18, 19, 22, 31–35. She also copied Price on much of her communication with Perry. *See, e.g.*, *id.*, Exs. 12, 13, 25, 26, 28. And in September 2012, Price had to host a meeting with Stephens's department to address the communication problems. *Id.*, Ex. 41 (Sept. 21, 2012 Email from Price to Department employees, including Stephens) ("I strongly believe we need to have a meeting as soon as possible to improve communications, outline expectations, and ensure we're all pulling in the same direction . . . Lisa [Stephens], as manager of the unit, it is your responsibility to outline your expectations on how the work will be accomplished and how the team will operate."). Based both on the content and number of emails from Stephens to Price, it

is apparent that Stephens relied heavily on Price for guidance on matters that were well within her purview as a manager.

The notice of termination also highlighted that Stephens failed to consistently "provide guidance and feedback in a professional manner" to her staff.[9]  Termination Notice at 1.  In support, the Secretary points to numerous emails from Stephens to Perry showing that she was unresponsive and impatient in both her tone and her directions.[10]  *See, e.g.*, Def.'s Mot. Exs. 12–15, 20–21, 25–28.  Stephens also set very tight deadlines on short notice.  *See, e.g., id.*, Ex. 21 (Feb. 6–13, 2013 Email Exchange).  After Perry had timely completed a task on a Friday, Stephens waited until the following Wednesday at 11:25 a.m. to respond with eleven follow-up questions; she expected a response by the end of the day.  *Id.*  At the same time, she also assigned another task to be completed by the following day.  *Id.*

Finally, the notice of termination explained that Stephens failed to respond in a timely fashion to leave requests and to deliver performance reviews.[11]  For instance, Stephens received numerous messages throughout her tenure asking her to act on leave requests that she had not acted on for months.  *See, e.g.*, Def.'s Mot. Exs. 16, 18 (weeks-old leave request in October

---

[9] Similarly, the performance review criticized Stephens's communication with staff.  2013 Interim Performance Discussion ("[W]hen directing staff, written communication should outline the requirements, timeframes for accomplishment, and be consistently professional.").

[10] For example, on one occasion, after Perry asked Stephens how to prioritize various assignments, Stephens responded: "I am not understanding why you choose to treat things as an 'either/or proposition . . . I shouldn't have to ask you to do this."  Def.'s Mot. Ex. 25 (March 26, 2013 Email Exchange).  When Perry responded to an email from another Department employee who had reached out to her directly, Stephens told Perry, without any further explanation, that she was "not acting like a team player when [she] respond[s] without checking in with us to decide a course of action."  *Id.*, Ex. 26 (March 27, 2013 Email Exchange).

[11] The performance review also directed her to "[t]ake timely action on leave requests" and to "[p]rovide . . . annual performance evaluations and interim discussions."  2013 Interim Performance Discussion.

2012); *id.*, Exs. 72–73 (June inquiries about outstanding leave requests from January and March). And an email chain between Price, Stephens, and Coppedge shows that Stephens did not provide Coppedge with her annual review for 2012. *See* Jan. 24, 2013 Email Exchange; *see also id.*, Def.'s Mot. Ex. 8 (Coppedge Decl.) ¶ 12, Dkt. 42-3. In an email from early June, Stephens admitted that she was not finished with the interim reviews for her supervisees which were due in April. *Id.*, Ex. 84.

If a factfinder credited this evidence, it could reasonably find that the Treasury's action was motivated by nondiscriminatory reasons—Stephens's difficulties managing her department and communicating with her team—that rendered her unfit for her position. *See Figueroa*, 923 F.3d at 1087. And the proffered reasons are facially credible given the record evidence. *See id. at* 1088; *Hogan*, 406 F. Supp. 3d at 44. The fourth and final *Figueroa* factor is also satisfied, as the Treasury's explanation is "clear and reasonably specific." *Figueroa*, 923 F.3d at 1088 (internal quotation omitted). The Secretary has given "specific examples and produced testimony and exhibits that show [Stephens's communication and management troubles]." *Hogan*, 406 F. Supp. at 44 (quoting *Figueroa*, 923 F.3d at 1088)).

   *2. Stephens's Evidence of Pretext*

To show that an employer's nondiscriminatory justifications are pretextual, a plaintiff can point to numerous sources of evidence, including "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). Stephens makes three of these arguments: (1) that she

was treated worse than white employees; (2) that her employer failed to follow its established procedures; and (3) that her employer's justifications were conflicting and false. Taken together, the Court is unpersuaded that Treasury's justifications for Stephens's negative performance review and Notice of Termination were in fact pretexts for discrimination.

i.   Comparator Evidence

Stephens's contention that she was treated worse than white employees, including Perry and "Caucasian and male managers who reported to Mr. Price," Pl.'s Opp'n at 29, Dkt. 48, does not prove that Treasury's rationales for issuing a negative performance review and a notice of termination to Stephens were pretextual. To start, Stephens's assertion that white male managers were treated more favorably relates solely to the resources they allegedly received, and not to any negative feedback they did or did not receive based on their managerial or communication skills. *Id.*[12] And because the Court previously dismissed Stephens's discrimination claim to the extent it relied on pre-June 2013 actions (e.g., that she received inadequate training and assistance), *see* Mem. Op. at 6–7, the fact that white male managers allegedly received more resources than did Stephens is irrelevant to her claim that Treasury's rationales for her work performance evaluations were pretextual. Even if it were, Stephens fails to identify the specific resources that she was denied that other managers received. *See* Pl.'s Opp'n at 29.[13]

More to the point, Stephens complains that Perry, a white woman, was not disciplined or

---

[12] Stephens also claims that she was "excluded from team meetings, group dinners, and process or Planning meetings." Pl.'s Opp'n at 30. She does not explain how this proves that Treasury's justifications were pretextual, nor does she provide record support beyond her own statement during proceedings before the EEOC. *See id.* (citing Pl's Opp'n Ex. 3 at 9, Dkt. 49-2). This statement gives no specific details as to when or from which meetings she was excluded.

[13] Indeed, her record support undercuts her claim of disparate treatment—one male manager did not receive training until he was six months into the job, and another felt that he "lack[ed]

terminated even though she acted unprofessionally and insubordinately.  Pl.'s Opp'n at 29.  The

Court agrees with Stephens that the record shows that Perry was unprofessional, insubordinate,

and disrespectful.  *See, e.g.*, Pl.'s Opp'n Ex. 11 at 136–37, Dkt. 50-2 (Memorandum of

Counseling to Perry, delivered by Stephens and Price, explaining Perry's failure to timely submit

leave requests); *id.*, Ex. 9 (Summary Report – Investigative Inquiry), at 1, 6, Dkt. 49-8 (detailing

evidence that Perry conducted herself unprofessionally in meetings).  But to prove pretext based

on comparator evidence, a plaintiff must "demonstrate that all of the relevant aspects of her

employment situation were 'nearly identical' to those of [the comparator]."  *Gonda v. Donahoe*,

79 F. Supp. 3d 284, 300 (D.D.C. 2015) (quoting *Neuren v. Adduci, Mastriani, Meeks & Schill*,

43 F.3d 1507, 1514 (D.C. Cir. 1995)).  Perry is not an appropriate comparator to Stephens

because Perry was a permanent, rather than a probationary employee, *see* Def.'s Reply Ex. 93

(Perry Dep. 8:19–25), Dkt. 53-7; Def.'s Mot. Ex. 4 (Stephens Dep.) at 182:17–19 ("[Perry] was

not probationary, she was part of a collective bargaining agreement[.]"), Dkt. 42-3.  *See*

*Holbrook v. Reno*, 196 F.3d 255, 262 (D.C. Cir. 1999) ("[A] probationary employee [is] not

similarly situated to a permanent employee[.]").  Moreover, Perry, an analyst, was not in

"management," Stephens Dep. at 182:17–19.  *See Burley v. Nat'l Passenger Rail Corp.*, 801

F.3d 290, 301 (D.C. Cir. 2015) (explaining that plaintiffs and proper comparators must have

"similar[]" "jobs and job duties"); *Banks v. District of Columbia*, 498 F. Supp. 2d 228, 234

(D.D.C. 2007) (finding that nurses with a difference of seven grade levels were not similarly

situated).  Therefore, even assuming that Perry's and Stephens's performance issues were the

---

completely adequate resources to properly manage programs for which [he was] responsible."
*See* Pl.'s Opp'n Ex. 12 at 210, 250, Dkt. 51-1.

same, these factual differences also make Perry an improper comparator.

                ii.     Failure to Follow Procedures

Stephens further notes that the agency failed to provide her with her interim performance review by the midpoint of the performance year, as required, and did not give her the chance to rebut the criticisms in that review.  Pl.'s Opp'n at 25.  These actions were inconsistent with agency policy, she argues, and therefore demonstrate pretext.  The Court disagrees.

First, the Treasury is not *required* to provide a probationary employee with an opportunity to respond or improve after receiving a negative performance review.  *See* 5 U.S.C. § 4303(b), (f)(2) (requiring that employees be given time to respond to a proposed "reduction in grade or removal" based on unacceptable performance, but exempting probationary employees from its scope); 5 C.F.R. §§ 432.102(b)(2), 432.104 (requiring that employees be given a "reasonable opportunity to demonstrate acceptable performance," but exempting probationary employees from its scope).  Here, Treasury fulfilled its regulatory mandate by "notifying [Stephens] in writing as to why [she was] being separated and the effective date of the action," detailing "the inadequacies of [her] performance or conduct."  5 C.F.R. § 315.804(a) (detailing the procedures for terminating probationary employees).

To be sure, Treasury did not follow its internal policies when it failed to give Stephens her performance review by the midpoint of the performance year (the end of April).  Policies and Procedures Manual – Performance Management Program at 9.  Plus, her interim performance review was issued "later than 90 days before the end of the probationary or trial period," contrary to the agency manual.  *Id.* at 37.  An "unexplained inconsistency can justify an inference of discriminatory motive."  *Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003).

But here, Stephens has not shown that the deviation from the stated procedure regarding

interim reviews was "so irregular or inconsistent with [the Treasury's] established policies" as to render unbelievable its reasoning behind the negative performance review and notice of termination.  *Bailey v. Wash. Metro. Transit Auth.*, 810 F. Supp. 2d 295, 307 (D.D.C. 2011) (quoting *Porter v. Shah*, 606 F.3d 809, 816 (D.C. Cir. 2010)).[14]  While it would have been more consistent with best practices to provide Stephens with formal written feedback and a meaningful opportunity to improve her performance before issuing a notice of termination, Price's failure to do so does not undermine the Secretary's nondiscriminatory rationales for taking adverse action. Demonstrating pretext "requires more than simply criticizing the employer's decisionmaking process," *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014), or showing that "a reason given for a job action [was] not just, or fair, or sensible."  *Fischbach*, 86 F.3d at 1183; *see also Forman v. Small*, 271 F.3d 285, 291 (D.C. Cir. 2001) ("Consistent with the courts' reluctance to become involved in the micromanagement of everyday employment decisions . . ., the question before the court is limited to whether [the plaintiff] produced sufficient evidence of [race or sex] discrimination, not whether [s]he was treated fairly.").

It is also difficult to conclude that an interim review would have made much difference given that Stephens was well aware that she was not processing leave requests in a timely fashion, *see supra* at 13, and that Price was frustrated about Perry and Stephens's inability to communicate and work effectively with one another, *see* Stephens Dep. at 200:19–20; Pl.'s Opp'n Ex. 9 (Summary Report – Investigative Inquiry), at 3.  Even so, these problems persisted

---

[14] Price also provided an explanation, under oath, for the delay in Stephens's interim performance review.  He testified that June 4 was the first day that their "travel schedules aligned such that [they] could have that meeting," and he "did not want to discuss the performance evaluation over the phone."  Def.'s Mot. Ex. 29 (Price Dep.) at 34–35, 37; *see Bailey*, 810 F. Supp. 2d at 307.  Although Price's testimony offers *some* explanation for the delay, it by itself does not explain why Stephens's review had to be in person, nor does it explain why her review was delayed by more than six weeks.

throughout her tenure.  And given her status as a probationary employee, even a timely and

positive interim report would not have insulated Stephens from termination.  Policies and

Procedures Manual – Performance Management Program at 37 ("However, a positive progress

review does not preclude a separation action if later performance is unacceptable.").

### iii.    The Secretary's Justifications

Although some of the Secretary's reasons for taking adverse action against Stephens lack

record support, many of Stephens's alleged management and communication failures are

supported by uncontroverted evidence.  Start with the Treasury's concern over Stephens's

communication and interpersonal skills.  The Notice gave five specific examples:

- Failure to consistently provide guidance and feedback to staff members in a professional manner when communicating in emails and in meetings
- Failure to consistently communicate with LB Directors in other departments, management officials, and colleagues in a professional manner using diplomacy when faced with opposing views or differing opinions;
- Failure to listen and respond appropriately when provided with constructive criticism and ways to improve your communication and performance;
- Failure to communicate in a way that consolidates and narrows the issues presented to [Price] and other management officials; and
- Lacking in personal accountability for communication challenges.

Termination Notice at 1–2.

Notwithstanding the record evidence discussed in section III.A.1, Stephens says these are

all untrue and that she "was never unprofessional in her communications."  Pl.'s Opp'n at 28.

She points to the fact that she often checked with Medina, the HR specialist, before sending

emails to Perry.  *Id.*; *see* Pl.'s Statement of Facts ¶ 8 (citing emails in the record from Stephens

to Medina).  It is true that Stephens frequently coordinated her messages to Perry with Medina.

*See, e.g.*, Def.'s Reply Ex. 90 (Feb. 21–25, 2013 Email Exchange), Dkt. 53-4.  And Medina

confirmed that she had "no specific concerns" about the "emails she had received so far," so long

as her tone towards Perry was "balance[d]" with how she "frame[d] up [her] requests with others

18

on [her] staff."  *Id.*  But this does not cast doubt on the Secretary's explanation that Price took

issue with Stephens's communication with Perry, unmediated by Medina, on many other

occasions.  *See, e.g.*, Def.'s Statement of Facts ¶ 8 (citing emails from Stephens to Perry that

Price found objectionable).  And the Court will not question the wisdom of Price's concern, only

whether it was honestly believed.  *See Fischbach*, 86 F.3d at 1183.  Stephens points to nothing in

the record that shows that Price was not genuinely concerned about her dealings with Perry.  In

fact, she herself admitted that she was "continually counseled to treat [Perry] better, to treat her

fairly."  Stephens Dep. at 200:19-20.

As noted above, multiple emails in the record from Stephens to Price contain a litany of

updates and requests, including mundane management questions that Price understandably

thought should not have risen to his level.  *See* Def.'s Statement of Facts ¶ 11; *see, e.g.*, Def.'s

Mot. Exs. 31 (asking how to have copies and folders made), 33 (asking about eight separate

issues in one email), 34 (asking about multiple issues in one email, including how to get approval

to rent a car).  Stephens makes no attempt to discredit the complaint that she failed to consolidate

and narrow workplace issues for Price.  And one of her own exhibits bolsters the charge that she

lacked personal accountability: the investigative report issued as a result of Perry's EEO

complaint noted that "neither Ms. Perry nor Ms. Stephens took responsibility for their actions in

contributing to conflict in the work place and a tense work environment."  Pl.'s Opp'n Ex. 9

(Summary Report – Investigative Inquiry), at 2.  Notably, Coppedge, the other employee whom

Stephens supervised, stated in her sworn declaration that "Ms. Stephens was not an easy person

to work for" and as such, "the atmosphere of [her] immediate work environment was very

strained and oppressive."  Coppedge Decl. ¶ 30.  Finally, Price also testified that Stephens failed

to communicate professionally with other directors and failed to respond appropriately to

criticism.  *See* Price Dep. at 25–32, 43.[15]  This evidence as a whole supports the Secretary's

neutral justification that Stephens had trouble communicating effectively with Price and her

staff.

As for the personnel management problems, the Notice provided four examples:

- Unwillingness to provide staff with timely approval or denial of leave requests and multiple requests remain outstanding;
- Failure to consistently submit your personal time sheets in a timely manner as you expect from your team members;
- Failure to timely provide annual performance or interim reviews for your staff members; and
- Failure to ensure expectations are consistent for all team members, e.g., flexible work schedules, work-at-home requests and leave requests.

Termination Notice at 2.

As discussed above in section III.A.1, the record shows that Stephens consistently did not

act on leave requests or deliver performance reviews for her staff.  Regardless whether she did

not receive training on these matters, *see* Pl.'s Opp'n at 27–29, it is undisputed that Stephens had

access to the OCC Manual that explained her responsibility as a supervisor to timely decide

leave requests and deliver performance reviews, Def.'s Statement of Facts ¶ 6; *see* Policies and

Procedures Manual – Leave Administration at 10 (leave requests); Policies and Procedures

Manual – Performance Management Program at 12 (explaining, despite Stephens's belief to the

contrary, that "[t]here is no minimum period of time that an employee must be under the

direction of a supervisor before that supervisor can write an annual appraisal").  The record also

reflects that Stephens knew that she needed to deliver Perry's annual performance review, *see*

---

[15] To be sure, there is no record support for these two assertions other than Price's sworn testimony.  But Stephens offers no evidence to the contrary other than in her unsworn response to the notice of termination.  *See* Response to Termination Notice at 6–7.  Nevertheless, the Court recognizes that these explanations for Stephens's termination are largely unsubstantiated in the record.

Dec. 20, 2012 Email from Stephens to Price.  Thus, her contention that she thought she was not on the job long enough to provide Coppedge with her review rings hollow.  *Cf.* Pl.'s Statement of Facts ¶ 28.

Stephens disputes two incidents in which the Secretary asserts that she did not act on Perry's leave requests.  *See* Pl.'s Opp'n at 29; Pl.'s Statement of Facts ¶¶ 15–21, 23.  In one of these cases, Perry had applied for Family Medical Leave to care for her ill mother and submitted the necessary medical documentation to the HR department.  Def.'s Mot. Ex. 53 (Nov. 1–7, 2012 Email Exchange), Dkt. 42-3.  Suspecting that Perry was lying about her mother's sickness, Stephens asked HR if she could review the documents before signing off on the request.  *Id.*  An HR officer responded that in the context of the FMLA program, which requires the submission of confidential medical information, "we allow the employee to submit the information to Human Resources instead, and then HR lets the supervisor know that the documentation is sufficient to support the request."  *Id.*  The HR officer also assured Stephens in two separate emails that Perry met the requirements of the program, and therefore was entitled to leave.  *Id.*; *see also* Def.'s Mot. Ex. 55 (Collective Bargaining Agreement), Dkt. 42-3, at 106 ("A supervisor may not . . . deny [FML] to an employee who meets the criteria and complies with the requirements and obligations under FMLA").  Even with these assurances from the HR officer, Stephens would not approve Perry's leave request.  In Stephens's view, the CBA allows the supervisor to require the submission of medical documentation.  Nov. 1–7, 2012 Email Chain (referencing Collective Bargaining Agreement at 100).  But Stephens's "subjective understanding" that she did not have to sign Perry's substantiated leave requests does not prove that her employer was dishonest when it faulted her for not doing so.  *See Warner v. Vance-Cooks*, 956 F. Supp. 2d 129, 167 (D.D.C. 2013).  Stephens is correct that the CBA allows a

supervisor to ask the employee to submit the relevant information, but it says nothing about who must review it.  And the HR officer assured Stephens *twice* that Perry met the requirements of the program.  Thus, even if Stephens were correct in her reading of the CBA, and the HR advisor mistaken, Stephens has not shown that Price's concern over this incident was fake or a pretext for discrimination.

In the other case, the Secretary asserts that Stephens wrongly led Price to believe that Perry was absent without leave in December 2012 when Perry had in fact submitted leave requests that Stephens had ignored.  Def.'s Statement of Facts ¶ 23; Termination Notice at 2. Stephens, for her part, claims that Perry could not be located for an entire week and had not requested leave.  Pl.'s Statement of Facts ¶ 23.  The Court cannot determine—based on a review of the emails in the record—which narrative is correct.  But the dispute is immaterial because the Secretary has submitted substantial evidence that Stephens repeatedly did not take timely action on leave requests.

As for inconsistent expectations for her team, the record shows that Stephens was skeptical of Perry's requests for remote work as well as leave.  *See, e.g.*, Def.'s Ex. 40 (Feb. 12, 2013 Email Exchange), Dkt. 42-3; Nov. 1–7, 2012 Email Exchange.  Stephens insists that this is because Perry abused the agency's leave procedures, and there is record evidence to support Stephens's view.  *See* Pl.'s Opp'n at 29.  Ultimately, however, this dispute goes to the *reasonableness* of the Treasury's concern over Stephens's conduct, which this Court will not "second-guess" or "micromanage[]."  *Gonda*, 79 F. Supp. 2d at 300 (internal quotations

omitted).[16]

In sum, although some of the reasons the Secretary listed for issuing the notice of termination are not robustly supported by the record, the Court cannot "second-guess an employer's personnel decision" on that basis alone, particularly where the Secretary's bases for Stephens's negative performance review and notice of termination are largely substantiated. *Fischbach*, 86 F.3d at 1183; *Hogan*, 406 F. Supp. 3d at 45 (denying sex discrimination claim where plaintiff failed to show that "*all* the [employer's] proffered reasons for firing her are pretexts"). Nor can the Court question the wisdom, "correctness[,] or desirability" of Treasury's beliefs about Stephens's performance deficiencies. *Fischbach*, 86 F.3d at 1183. The Court must instead determine, "based on an examination of the entire record" whether "the plaintiff has adduced sufficient evidence to enable a reasonable jury to conclude" that the employer's stated reason was pretextual and the actual reason was *discriminatory*. *Barot v. Embassy of Republic of Zambia*, 299 F. Supp. 3d 160, 185 (D.D.C. 2018). Stephens has not done so here. "[I]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993); *accord Reeves v. Sanderson Plumbing Probs.*, 530 U.S. 133, 148 (2000).

Not only has Stephens failed to rebut many of the Secretary's justifications for the adverse actions, she has not pointed to anything in the record that suggests that race or sex played a role in these decisions. *See Johnson v. Perez*, 823 F.3d 701, 709 (D.C. Cir. 2016) (concluding that the record "could not support a reasonable inference of discrimination" even

---

[16] The notice of termination also asserts that Stephens failed to timely submit her personal time sheets. Neither party discusses this example in their respective statements of fact, and the Court cannot locate support for it in the record. But this reason for terminating Stephens is immaterial, as there is undisputed record support for the Notice's other examples.

though it "permit[ted] a jury to find that an employer's reasons [were] false").  Stephens identifies "no explicit statements, no sly hints, and no ambiguous remarks or circumstances that could be interpreted as a reference or reaction to her [race or sex].  *Barot*, 299 F. Supp. 3d at 186.  Indeed, in her deposition, she admitted that she has "no evidence" that she was terminated "because of [her] race or [her] sex."  Stephens Dep. at 198:14–15.

There is little question that Stephens faced difficult personnel issues in her unit and had "less than ideal" support from management.  Interim Performance Review at 1.  Both Perry's unprofessional conduct and Price's hands-off managerial approach made it challenging for Stephens to succeed during her probationary period.  Even so, based on the existing record, no reasonable juror could conclude that the Secretary's proffered reasons for taking adverse actions against Stephens were pretextual.  To the contrary, the record demonstrates that Price genuinely believed that Stephens's managerial and communication skills were not adequate to excel in the difficult job she held and that these deficiencies negatively impacted her working relationship with Price, Perry, and others with whom she worked and interacted, including Coppedge.

In light of the uncontroverted evidence, the Secretary's minor deviations from procedure and few unsupported bases for her actions could not lead a reasonable juror to conclude that the Treasury Department intentionally discriminated against Stephens *on the basis of race or sex*.  *See Evans v. Sebelius*, 716 F.3d 617, 623 (D.C. Cir. 2013) (explaining that even where the employer's action was "procedurally flawed," the plaintiff "must still provide sufficient evidence that the government's proffered explanation is pretext for *racial* discrimination").  That conclusion is further supported here where Price, "the person who made the decision to fire [Stephens] was the same person who made the decision to hire," and "the firing [] occurred only a short time after the hiring.'"  *Johnson v. Perez*, 66 F. Supp. 3d 30, 38 (D.D.C. 2014) (quoting

*Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011)).  Indeed, Stephens's

"own statements belie the notion that [race and] sex discrimination was the reason for her

termination."  *Robinson-Douglas v. Coastal Int'l Sec., Inc.*, 287 F. Supp. 3d 14, 20 (D.D.C.

2018).  In her Response to the Notice of Termination—on which she relies in her Statement of

Facts—Stephens indicated that she believed she was fired not because of her communication or

management issues, but instead "as a scapegoat for addressing problems with Ms. Perry's

employment."  Response to Termination Notice at 125.  Maybe so.  But that itself is not a

prohibited reason under Title VII.  *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir.

1998).

      Viewing all of Stephens's rebuttal evidence together, the Court concludes that she has not

produced sufficient evidence to persuade a jury that the Treasury Department intentionally

discriminated against her on the basis of race or sex.  *Brady*, 520 F.3d at 494.  Accordingly, the

Court will grant the Secretary's motion for summary judgment with respect to Stephens's

discrimination claim.

      **B.**    **Retaliation**

      Second, Stephens claims that the Treasury retaliated against her for expressing interest in

filing an EEO complaint.  Compl. ¶¶ 49–54.  Title VII's anti-retaliation provision prohibits an

employer from discriminating against an employee because she has opposed a practice that Title

VII forbids.  42 U.S.C. § 2000e-3(a).  Where, as here, a plaintiff relies only on circumstantial

evidence of retaliation under Title VII, the *McDonnell Douglas* burden-shifting framework,

described above, applies.  *See Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

      Under that framework, the plaintiff bears the initial burden of establishing a prima facie

case of retaliation.  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (per curiam).  To

establish a prima facie case of retaliation under Title VII, the plaintiff must show (1) that she

engaged in statutorily protected activity; (2) that she was subjected to a materially adverse employment action; and (3) that there is sufficient evidence to infer a causal connection between the protected activity and the employment action.  *Id.*  "Adverse actions" in the retaliation context are "not limited to discriminatory actions that affect the terms and conditions of employment."  *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 64 (2006).  But a plaintiff must show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 68 (internal quotation marks omitted).

If the plaintiff states a prima facie case, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the challenged action.  *Wiley*, 511 F.3d at 155 (internal quotation marks omitted).  If the employer articulates a nondiscriminatory justification, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence."  *Jones*, 557 F.3d at 677 (internal quotation marks omitted).

Stephens has failed to state a prima facie case of retaliation, as she has not raised an inference that her protected EEO activity in February 2013 caused her negative performance review and termination in June.  Stephens provides no evidence that Price was aware that she discussed filing an EEO complaint with Tudisco in February 2013.  *Holcomb*, 433 F.3d at 903 (citing *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C. Cir. 1985)).  In fact, Stephens admitted in her deposition that she did not know "to tell [Price] that [she] was filing an EEO complaint against Jamie-Jo Perry."  Stephens Dep. at 182:7–8.  She conceded that she "[did not] know what [Price] knew."  *Id.* at 182:24.  And Price testified that he had no knowledge of her protected activity.

Price Dep. at 115:20–25.  That Price was aware of Stephens's general complaints about Perry is not enough to show knowledge of her protected activity.  *Cf.* Pl.'s Opp'n at 38.

Stephens also fails to prove causation through temporal proximity.  *Holcomb*, 433 F.3d at 903.  Although no bright line rule exists, "this Circuit has generally found that a two- or three-month gap between the protected activity and the adverse employment action does not establish the temporal proximity needed to prove causation."  *Jones v. D.C. Water & Sewer Auth.*, 922 F. Supp. 2d 37, 42 (D.D.C. 2013); *see, e.g.*, *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (holding that a two-and-a-half-month lapse was too long to assume temporal proximity).  Stephens told Tudisco that she was considering filing an EEO complaint against Perry in February.  Def.'s Statement of Facts ¶ 30.  But she did not receive a negative performance review or Notice of Termination until June.  The four-month gap, with nothing more, does not show causality.  Because Stephens cannot establish her prima facie case, the Court will grant the Secretary's motion for summary judgment with respect to Stephens's retaliation claim.

## C.       Hostile Work Environment

Finally, Stephens claims that she experienced a hostile work environment.  Compl. ¶¶ 42–48.  To support a hostile work environment claim, a plaintiff must establish that "(1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of her [protected class]; and (4) the harassment affected a term, condition, or privilege of her employment."  *Richardson v. Petasis*, 160 F. Supp. 3d 88, 123 (D.D.C. 2015).  The alleged harassment must be "so severe or pervasive as to alter the conditions of the [the plaintiff's] employment and create an abusive working environment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (citation and internal quotation marks omitted).  The environment must be both "objectively and subjectively offensive."  *Id.* at 787.  "To determine whether an environment is objectively abusive, courts consider the totality of the circumstances,"

27

including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Richardson*, 160 F. Supp. 3d at 126 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (citation omitted).

The negative performance review and notice of termination, the only employer actions remaining in this case, do not come close to constituting a hostile work environment.  "[C]ourts have been hesitant to find a claim for hostile work environment when a complaint contains no allegations of discriminatory or retaliatory intimidation, ridicule, or insult in the plaintiff's day-to-day work environment and relies instead on incidents of allegedly discriminatory non-promotions and other performance-based actions." *Outlaw v. Johnson*, 49 F. Supp. 3d 88, 91 (D.D.C. 2014) (internal quotation marks omitted).  Two performance-based actions are all Stephens can show here.  She points to no instances of abusive, threatening, or humiliating conduct.  Therefore, the Court will grant the Secretary's motion for summary judgment with respect to Stephens's hostile work environment claim.

## CONCLUSION

For the foregoing reasons, the Court grants the Secretary's motion for summary judgment.  A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

Date: November 23, 2021